KLUSS, Appellant,

v.

ALCAN ALUMINUM CORPORATION, Appellee, et al.

KLUSS, Appellee,

v.

ALCAN ALUMINUM CORPORATION, Appellant, et al.

[Cite as *Kluss v. Alcan Aluminum Corp.* (1995), 106 Ohio App.3d 528.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

Nos. 66255, 68459.

Decided Sept. 25, 1995.

530

*Andrew L. Johnson, Jr.*, for Geoffrey H. Kluss.

*Arter & Hadden* and *Irene C. Keyse–Walker; Alfred R. Cowger, Jr.*, for Alcan Aluminum Corp.

---

JAMES M. PORTER, Judge.

Defendant-appellant Alcan Aluminum Corporation appeals from a jury verdict of $400,000 in favor of plaintiff-appellee Geoffrey H. Kluss arising out of defamation when he was terminated from his employment at Alcan (case No. 68459). Defendant claims that the trial court erred in not granting it summary judgment, a directed verdict or a new trial. The defendant also claims that the verdict was excessive, the result of passion and prejudice, and influenced by plaintiff's improper final argument relying on evidence of damages for economic loss on the withdrawn wrongful discharge claim. In the absence of a new trial, defendant claims remittitur is appropriate. Plaintiff Kluss appeals the trial court's denial of his claim for prejudgment interest (case No. 66255). Plaintiff asserts error in the court's failure to hold a prejudgment interest hearing and defendant's failure to make a good faith offer of settlement. We find no reversible error in case No. 68459 and affirm for the reasons hereinafter stated. We reverse and remand in case No. 66255 for an oral hearing on prejudgment interest.

Plaintiff is thirty-seven years old, married, without children. He joined Alcan in 1985 when his previous employer was purchased by Alcan. At the time of the purchase, plaintiff was the traffic coordinator of a Kentucky smelting plant. He retained the same job title and responsibilities under Alcan. In 1986 he was promoted to the position of Supervisor of Traffic and Warehousing at Alcan's Cleveland headquarters. He had overall responsibility for all the transportation and warehousing of aluminum ingots and other products of Alcan in the United States and abroad.

Plaintiff was recognized as a very good Alcan employee and received good evaluations, awards and bonuses for his initiatives in cost saving and management. His base annual salary rose to about $51,000 in 1990, with a yearly expense account of about $30,000.

Plaintiff participated in Alcan's college tuition reimbursement program for those promising employees who attended college and earned degrees. Plaintiff was encouraged by his then superiors to pursue a two-year M.B.A. program, which he entered at Baldwin Wallace College in the fall of 1989. When he enrolled, his superior had business cards printed listing plaintiff as Manager of Transportation and Warehousing and told plaintiff it was a "cinch" that his job would be upgraded to manager from supervisor. He received his M.B.A. in 1991 after discharge.

Plaintiff testified that he felt he had secure, future employment with Alcan and he planned to remain permanently with Alcan until retirement. Plaintiff was able to continue working full-time for Alcan while pursuing his M.B.A. on weekends during the two-year program. He received tuition reimbursement under the plan, except for $4,500 that was not reimbursed after his discharge and was at issue in the lawsuit.

Plaintiff's discharge arose out of a claim of conflict of interest involving a trucking company which serviced Alcan. Plaintiff's friend, Charles Redmon, owned a trucking agency known as Distribution Concepts in Owensboro, Kentucky. The company was one of more than forty companies that received truck hauling assignments through plaintiff's work for Alcan. Redmon informed plaintiff of his desire to establish a foreign trade zone in western Kentucky and consulted with plaintiff in formulating the program since plaintiff was working on his M.B.A.

Plaintiff testified that Distribution Concepts had no assets so he acted as an unpaid consultant as part of his M.B.A. work, that plaintiff gave no trucking assignments to Redmon after March 1989 to avoid potential conflicts of interest, and that plaintiff's immediate supervisor at Alcan and the Vice President of Sales knew that plaintiff was an unpaid consultant for Distribution Concepts in establishing the Kentucky trade zone and had no objection to the arrangement.

However, after plaintiff enrolled at Baldwin Wallace in 1989, his previous superiors left Alcan's employment and were replaced by new managers. Plaintiff claimed that the new managers were not familiar with plaintiff's past work or with his consulting arrangement with Distribution Concepts. Nor were they aware that the prior managers had encouraged plaintiff, recommended that he pursue the M.B.A. program at Baldwin Wallace and told him that it would enhance his opportunities for promotion by completing his course work.

On Sunday, March 10, 1991, plaintiff's new supervisor turned on plaintiff's computer and discovered letters and other information relating to Distribution Concepts. He became suspicious and reported his findings to the new Vice President of Sales, who ordered an immediate investigation by Alcan's senior legal counsel and personnel manager. The investigators concluded that plaintiff had become an employee of Distribution Concepts, since they found in his company computer a letter addressed to the Mayor of Owensboro, Kentucky, relating to the free trade zone and listing plaintiff as Executive Vice President of Distribution Concepts. They also found the Articles of Incorporation for Distribution Concepts listing plaintiff as Vice President of Finance. They also found that plaintiff had charged numerous long distance phone calls and Federal Express communications involving Distribution Concepts to his Alcan expense account.

The Alcan officials confronted plaintiff with this information on April 3, 1991 in a conference room at Alcan's Cleveland headquarters. Plaintiff told them that he knew Charles Redmon and that Distribution Concepts was Redmon's company; that he was not an employee of Redmon or Distribution Concepts; that he was unaware and did not authorize his name to be placed on Distribution Concepts' Articles of Incorporation as its Vice President of Finance; that the letter found on his company computer addressed to the Mayor of Owensboro, Kentucky was never mailed to anyone; that he had not taken any money from Redmon; and that he had not given any of Alcan's trucking business to Redmon in exchange for money. The chief legal officer accused him of taking money under the table ("kickbacks"), and he was terminated. Plaintiff argued that his new superiors wanted to get rid of him because he had not gone through channels in sending critical suggestions to Alcan's Montreal office and that the conflict of interest claim was a subterfuge.

The following day, April 4, 1991, the new manager prepared a memorandum under his signature addressed "To all Alcan Ingot and Alcan Recycling Employees," stating:

"This is to advise that Geoffrey Kluss is no longer employed by Alcan as of April 3, 1991.

"It had come to our attention that he was employed by another company and that this company was on the list of transportation companies to use.

"All matters concerning warehousing and onward transportation should be referred to me until further notice."

The memorandum was disseminated to everyone on the seventh floor of Alcan headquarters, which included various computer people working for an independent contractor at Alcan. It was faxed to Alcan's offices in Los Angeles, Dallas and Atlanta. A copy was also posted on the company bulletin board.

Within minutes after the fax, plaintiff's secretary began receiving phone calls regarding it from Alcan employees who worked with plaintiff. Non–Alcan employees also called. The former Vice President of Sales called to say that he had just read the memorandum and stated: "I can't believe Alcan allowed it to be sent out." Plaintiff testified to calls from former trucking company personnel who knew that he was fired for accepting kickbacks.

Plaintiff testified that he felt totally humiliated and stripped of his dignity by the manner in which he was treated by Alcan. His college professors noted a big difference in his attitude, and his good grades began slipping. His marriage deteriorated. He went into periods of depression, and refused to speak to his wife. She became the sole wage earner and payer of the bills, which contributed to plaintiff's guilty feelings. They were unable to take vacations together or do things they used to do. They placed their plans for having children on hold due to their financial constraints and the communications gap. They eventually separated. They unsuccessfully attempted to sell their residence in Lakewood, Ohio, where plaintiff still resided alone. The wife eventually moved to Nashville.

After discharge by Alcan, plaintiff was unable to find new employment in a depressed economy, despite extensive personal efforts and use of employment agencies. He finally started his own small business which had only modest financial success.

Plaintiff filed his lawsuit against Alcan and its officials seeking $500,000 in compensatory damages and $250,000 in punitive damages. He claimed that he was wrongfully discharged based on promissory estoppel and was defamed by the memo issued when he was fired. Dr. John Burke, an economist, testified that plaintiff's economic losses from being discharged were $339,759, based on his past earning history and inability to obtain similar employment.

Alcan counterclaimed for $200,000 from plaintiff for the alleged personal use of his company computer, abuse of his company expense account, alleged use of long distance telephone and Federal Express services for non-Alcan business, and breach of loyalty to the company. Alcan's motion for summary judgment was denied and the case went to a jury trial on June 14, 1994.

At the end of plaintiff's case and at the end of all the evidence, Alcan's motions for a directed verdict were overruled. Alcan voluntarily dismissed its counterclaim during the trial.

The case was submitted to the jury on the promissory estoppel and defamation theories plus punitive damages. Plaintiff's counsel argued for $500,000 in damages. The jury found that Alcan and two of its officials had maliciously defamed plaintiff without a qualified privilege to do so and awarded him $400,000 in damages against Alcan only. No punitive damages were awarded. The jury also found against plaintiff and in favor of Alcan and the other defendants on the promissory estoppel claim. Alcan's motions for new trial or in the alternative for remittitur were denied without opinion.

Alcan had offered $20,000 to plaintiff in settlement about four months before commencement of the trial. Kluss sought $500,000 in settlement and never budged from that demand. Alcan then withdrew its offer about two months before trial. Plaintiff filed his motion for prejudgment interest claiming Alcan's lack of good faith in settlement.

Plaintiff then filed his appeal from the denial of his motion for prejudgment interest under case No. 66255. Plaintiff's App.R. 9(E) motion to supplement the trial record in various respects was granted by the trial court. Alcan appealed from the $400,000 judgment in what is now case No. 68459. The two appeals have been consolidated for argument and disposition.

## APPEAL NO. 68459

We shall first address defendant Alcan's assignments of error then plaintiff's appeal of the denial of prejudgment interest.

"I.  The trial court erred by denying defendant-appellant's motion for summary judgment on plaintiff-appellee's claim for wrongful discharge.

"II.  The trial court erred by denying defendant-appellant's motions for directed verdict on plaintiff-appellee's claim for wrongful discharge."

The jury was charged on defamation and promissory estoppel. It returned verdicts in favor of plaintiff on the defamation claim and in favor of defendants on the promissory estoppel claim. No wrongful discharge claim was submitted to the jury. Defendant nevertheless argues that the trial court erred in denying its motions for summary judgment and directed verdict on plaintiff's wrongful discharge claim even though it was not submitted to the jury and defendant prevailed at trial on the promissory estoppel claim. Defendant argues that the trial court's failure to grant the motions for summary judgment and directed verdict on wrongful discharge and promissory estoppel improperly allowed the introduction of evidence of economic loss that influenced and enhanced the jury's

$400,000 damage verdict for plaintiff on the defamation claim. Defendant argues that the testimony of plaintiff's economic expert as to lost income was limited to the wrongful discharge claim, which was not submitted to the jury and should not have been part of the case. We find defendant's argument is without merit.

The defendant's argument is substantially undercut by the recently announced doctrine of *Continental Ins. Co. v. Whittington* (1994), 71 Ohio St.3d 150, 642 N.E.2d 615, syllabus:

"Any error by a trial court in denying a motion for summary judgment is rendered moot or harmless if a subsequent trial on the same issues raised in the motion demonstrates that there were genuine issues of material fact supporting a judgment in favor of the party against whom the motion was made."

■ Although the instant case is different, the rationale of *Whittington* strongly suggests that a defendant cannot assign as error the denial of a motion for summary judgment where he later prevails at trial on the disputed issue. If the defendant's assignment of error is mooted and harmless when he loses at trial, as *Whittington* holds, it would be incongruous to allow him to complain when he prevails at trial on that issue. Since the defendant eventually prevailed at trial on the two other summary judgment claims (wrongful discharge and promissory estoppel), any error in the court's denial of summary judgment or directed verdict to defendant on those claims would be likewise moot and harmless.

Plaintiff convinced the jury that he was defamed by the malicious actions of the defendant in publishing a memorandum which implied that he was accepting "kickbacks" by awarding hauling contracts to a trucking company by which he was employed.

■ "In Ohio, 'libel' is defined generally as a false written publication, made with some degree of fault, reflecting injuriously on a person's reputation, or exposing a person to public hatred, contempt, ridicule, shame or disgrace, or affecting a person adversely in his or her trade, business or profession." *A & B—Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council* (1995), 73 Ohio St.3d 1, 7, 651 N.E.2d 1283, 1289; *Ashcroft v. Mt. Sinai Med. Ctr.* (1990), 68 Ohio App.3d 359, 365, 588 N.E.2d 280, 283–284; *Matalka v. Lagemann* (1985), 21 Ohio App.3d 134, 136, 21 OBR 143, 145–146, 486 N.E.2d 1220, 1222–1223. Damages for defamation may include impairment of reputation, personal humiliation, mental anguish and suffering. *Rogers v. Buckel* (1992), 83 Ohio App.3d 653, 659, 615 N.E.2d 669, 672–673; *Thomas H. Maloney & Sons, Inc. v. E.W. Scripps Co.* (1974), 43 Ohio App.2d 105, 110, 72 O.O.2d 313, 316, 334 N.E.2d 494, 498–499. The memorandum in question impugned the honesty, integrity and loyalty of the plaintiff and raised jury issues as to whether he was defamed within

the scope of these authorities. Defendant does not assign error in the submission of the defamation claim to the jury.

In addition to mootness previously discussed, there are several other reasons why defendant's argument is not persuasive. In the first place, at the time Dr. Burke's testimony was offered, wrongful discharge and promissory estoppel were still issues in the case, and the evidence was properly admitted. In any event, defense counsel made no objection to the introduction of this evidence and is deemed to waive its admissibility. "Error may not be predicated upon a ruling which admits * * * evidence [unless] * * * a timely objection or motion to strike appears of record, stating the specific ground of objection * * *." Evid.R. 103(A)(1).

Second, when it became apparent that the court was not going to charge the jury on wrongful discharge, defense counsel made no motion to strike the Burke testimony, nor did he request a jury instruction that the jury was required to disregard it. No objections or requests for additions to the charge as given were made by either counsel. This again operated as a waiver of any objections to the testimony or the jury's consideration of the evidence. "On appeal, a party may not assign as error the giving or the failure to give any instruction unless the party objects before the jury retires * * *." Civ.R. 51(A). *Leber v. Smith* (1994), 70 Ohio St.3d 548, 552, 639 N.E.2d 1159, 1162; *Schade v. Carnegie Body Co.* (1982), 70 Ohio St.2d 207, 209, 24 O.O.3d 316, 317, 436 N.E.2d 1001, 1002–1003.

Third, a plaintiff may recover for economic losses including lost income and loss of earning capacity in a defamation suit where evidence is adduced to show a nexus between the damages and the defamation. *Embers Supper Club, Inc. v. Scripps–Howard Broadcasting Co.* (1984), 9 Ohio St.3d 22, 26, 9 OBR 115, 118, 457 N.E.2d 1164, 1167–1168; *A & B–Abell Elevator Co., Inc. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council* (Sept. 30, 1993), Franklin App. No. 92AP–1541, unreported, 1993 WL 387179. Therefore, the testimony of Dr. Burke was properly admissible at trial in support of plaintiff's claim for defamation or promissory estoppel. Plaintiff in his complaint alleged that the memorandum published by defendant caused him to suffer "a substantial loss of income and employability, both present and in the future." Defendant clearly was aware of plaintiff's claimed damages and was under the affirmative duty to contest them.

We also note from a review of the record that in final argument plaintiff's counsel did not mention or exploit Dr. Burke's testimony at any time. Defense counsel on the other hand stated as follows to the jury in final argument:

"Now, last, but not least—oh, and before I get to that, let me throw out one thing to you. He mentioned something about lost wages. You're not going to hear the Judge instruct you as to lost wages and defamation because there weren't any here. So you don't even have to think about that.

"You don't have to think about Dr. Burke's testimony, however, whatever worth that was."

The trial court *did not* instruct the jury it could award economic losses (lost income), but explicitly limited its damage instruction to defamation injuries as follows:

"You will determine from the preponderance of the evidence an amount of money that will reasonably compensate the plaintiff for the actions of the defendants.

"In determining that amount, you may consider damages caused to the plaintiff's reputation, mental anguish suffered, emotional distress, embarrassment among his family, friends and former job associates and interference with his marriage."

Although defendant argues that plaintiff's counsel did improperly refer to the job loss in his final argument, we find such references fleeting and inconsequential. Defense counsel neither made objections to them nor requested curative instructions.

Assignments of Error I and II are overruled.

"III. The trial court erred by denying defendant-appellant's motion for new trial or, in the alternative, remittitur."

We note that defendant does not assign as error the trial court's failure to grant summary judgment or direct a verdict on the defamation claim, which is the only claim on which plaintiff prevailed. By virtue of defendant's not appealing those rulings, it must be assumed that there was sufficient evidence to take the defamation claim to the jury. The sole issue remaining is whether the trial court should have granted a new trial because the jury verdict of $400,000 was excessive due to passion or prejudice.

■ Our review of a trial court's denial of a motion for a new trial is severely circumscribed. As we stated in *Bell v. Mt. Sinai Med. Ctr.* (1994), 95 Ohio App.3d 590, 595, 643 N.E.2d 151, 155:

"A trial court is afforded wide discretion in determining the propriety of a new trial. See *Osler v. Lorain* (1986), 28 Ohio St.3d 345, 28 OBR 410, 504 N.E.2d 19; *Jenkins v. Krieger* (1981), 67 Ohio St.2d 314, 21 O.O.3d 198, 423 N.E.2d 856; *Rohde v. Farmer* (1970), 23 Ohio St.2d 82, 52 O.O.2d 376, 262 N.E.2d 685; *Verbon v. Pennese* (1982), 7 Ohio App.3d 182, 7 OBR 229, 454 N.E.2d 976. An order

which denies a new trial will, therefore, be reversed only upon a showing of an abuse of discretion. *Rohde*, paragraph one of the syllabus. The term 'abuse of discretion' connotes more that an error of law or judgment; it implies that the court's attitude was unreasonable, arbitrary or unconscionable. *Id.*, 23 Ohio St.2d at 87, 52 O.O.2d at 378–379, 262 N.E.2d at 688–689."

On appeal, we are also particularly circumspect about attributing passion or prejudice to a jury's determination of damages, a matter peculiarly in their province. As stated in *Shimola v. Cleveland* (1992), 89 Ohio App.3d 505, 514, 625 N.E.2d 626, 632:

"An appellate court cannot disturb a jury's assessment of damages unless the award lacks support from any competent, credible evidence or resulted from passion or prejudice. *Baum v. Augenstein* (1983), 10 Ohio App.3d 106, 10 OBR 129, 460 N.E.2d 701. Whether a jury's award should be set aside requires a review of the record to determine if the ' "damages * * * were induced by (a) admission of incompetent evidence, or (b) by misconduct on the part of the court or counsel, or (c) whether the record discloses any other action occurring during the course of the trial which can reasonably be said to have swayed the jury in its determination of the amount of damages that should be awarded." ' *Loudy v. Faries* (1985), 22 Ohio App.3d 17, 19, 22 OBR 52, 54, 488 N.E.2d 235, 237, quoting *Hughes v. Laurence* (Nov. 12, 1981), Summit App. No. 10211, unreported, at 3–4, 1981 WL 4238."

Finally, as this court recently noted in *Webster v. Oglebay Norton Co.* (Jan. 26, 1995), Cuyahoga App. No. 65502, unreported, at 2, 1995 WL 32628:

"In analyzing this assignment, we recognize 'that passion and prejudice is not proved by the mere size of a verdict.' *Sindel v. Toledo Edison Co.* (1993), 87 Ohio App.3d 525, 532, [622 N.E.2d 706, 710]. Further, '[I]t must appear that the jury's assessment of damages was so disproportionate as to shock reasonable sensibilities.' "

The jury awarded plaintiff $400,000 for defamation. There is no indication from the verdict forms or the answers to special interrogatories that the jury considered Dr. Burke's economic loss testimony in arriving at its verdict of $400,000. Plaintiff offered testimony of his injuries sufficient to support a verdict of $400,000 without any consideration of Dr. Burke's testimony. There was testimony of how he was humiliated and embarrassed, how his academic performance at Baldwin Wallace College dropped, how he was distressed, shocked and withdrawn from his wife, how the couple put off having children for lack of income, and how they separated, finally sold their residence in Lakewood, Ohio and moved from the state of Ohio. His Alcan career was destroyed and his business reputation was seriously damaged in the trade. The extent of that

injury and the amount of damages that would reasonably compensate him was for the jury to determine. *Cooper v. Grace Baptist Church* (1992), 81 Ohio App.3d 728, 736, 612 N.E.2d 357, 362.

The rationale for allowing the jury wide discretion in these kinds of cases was explained in *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 349–350, 94 S.Ct. 2997, 3011–3012, 41 L.Ed.2d 789, 810–811:

"The common law of defamation is an oddity of tort law, for it allows recovery of purportedly compensatory damages without evidence of actual loss. Under the traditional rules pertaining to actions for libel, the existence of injury is presumed from the fact of publication. Juries may award substantial sums as compensation for supposed damage to reputation without any proof that such harm actually occurred. * * * More to the point, the States have no substantial interest in securing for plaintiffs such as this petitioner gratuitous awards of money damages far in excess of any actual injury.

" * * *

"It is necessary to restrict defamation plaintiffs who do not prove knowledge of falsity or reckless disregard for the truth to compensation for actual injury. We need not define 'actual injury,' as trial courts have wide experience in framing appropriate jury instructions in tort actions. Suffice it to say that actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation and mental anguish and suffering."

We again find the language in *Shimola v. Cleveland, supra,* 89 Ohio App.3d at 514, 625 N.E.2d at 632, appropriate and applicable to the circumstances before us:

"In the instant case, it is initially noted that the city allowed a vast amount of this now challenged testimony to be offered without objection. Generally, when a party fails to object to the introduction of evidence, the party waives the right to assign as error the introduction of the evidence. Nevertheless, the city failed to demonstrate any improper influence that induced passion or prejudice. There was sufficient competent, credible evidence to support the jury award to compensate Shimola for his property that was wrongfully converted by the city and for damages suffered as a result of the city's actions."

We do not find any evidence of attorney misconduct, improper admission of evidence, improper instructions or other activities that would have impassioned or prejudiced the jury. Given the jury's unique role in determining damages for personal anguish, humiliation and emotional distress, in such circumstances, we cannot say that the substantial award was excessive or shocks the conscience.

That being so, we find the trial court did not abuse its discretion in denying the motion for a new trial. The issue of remittitur is therefore moot and will not be addressed. App.R. 12(A)(1)(c).

Defendant Alcan's Assignment of Error III is overruled.

The judgment for plaintiff in case No. 68459 affirmed.

### APPEAL NO. 66255

■ Following the jury verdict and $400,000 judgment thereon, plaintiff filed a timely motion for prejudgment interest pursuant to R.C. 1343.03(C) for defendant Alcan's failure to make a good faith effort to settle the case before trial. Following briefing with attached exhibits, the trial court denied the motion without an oral hearing requested by the plaintiff, and without explanation or opinion. Plaintiff contends that the trial court erred in not holding an oral hearing and abused its discretion in denying the prejudgment interest motion.

Plaintiff's first assignment of error states as follows:

"I.   The court erred as a matter of law in failing to hold an oral hearing on the motion for prejudgment interest."

There is respectable case authority among Ohio's appellate courts to support Alcan's argument that a trial court is not required to hold an oral hearing on a motion for prejudgment interest under R.C. 1343.03(C). See *Novak v. Lee* (1991), 74 Ohio App.3d 623, 631, 600 N.E.2d 260, 262 ("There is a substantial diversity of opinion as to whether the statute requires a hearing"); *Bitzer v. Lincoln Elec. Co.* (1990), 67 Ohio App.3d 53, 585 N.E.2d 978; *Laverick v. Children's Hosp. Med. Ctr. of Akron, Inc.* (1988), 43 Ohio App.3d 201, 540 N.E.2d 305; *Younger v. Buckeye Local School Dist.* (July 8, 1992), Summit App. No. 2065, unreported, 1992 WL 161163. However, those authorities must give way to the Supreme Court's recent pronouncement on the issue which states that "the trial court must hold a hearing on the [prejudgment interest] motion." *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 658, 635 N.E.2d 331, 347.

Accordingly, we sustain the plaintiff's Assignment of Error I, reverse and vacate the denial of the motion for prejudgment interest, and remand the cause to the trial court for a hearing in accordance with *Moskovitz*.

It is premature to address plaintiff's Assignment of Error II, asserting an abuse of discretion in denial of the motion, and we intimate no ruling on that assignment of error.

The judgment denying prejudgment interest in case No. 66255 is reversed and vacated. The cause is remanded for a hearing on prejudgment interest.

*Judgment accordingly.*

PATTON, C.J., and HARPER, J., concur.