NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0273n.06

Nos. 22-3399/22-3901

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | |
|---|---|
| WALLAKE POWER SYSTEM, LLC, | ) |
|     Plaintiff-Appellee (No. 22-3399), | ) |
|     Plaintiff-Appellant (No. 22-3901), | ) |
| | ) |
| v. | ) |
| | ) |
| ENGINE DISTRIBUTORS, INC., Agent/Service of Process Information; JERRY KOSNER, | ) |
|     Defendants-Appellants (No. 22-3399), | ) |
|     Defendants-Appellees (No. 22-3901). | ) |
| | ) |

**FILED**
Jun 13, 2023
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

OPINION

Before: BOGGS, LARSEN, and NALBANDIAN, Circuit Judges.

LARSEN, Circuit Judge. Plaintiff Graham Ford, Inc. was a distributor of Ford engines and transmissions.[1] A jury found that rival distributor Engine Distributors, Inc. (EDI) defamed Graham Ford by telling an essential third-party supplier, Ford Component Sales, LLC (FCS), that Graham Ford had violated federal emissions laws. The jury also determined that these defamatory statements caused FCS to terminate its contract with Graham Ford, forcing Graham Ford to wind down its business. The jury awarded Graham Ford over $1 million in damages, plus attorneys' fees. But the district court set this damages award aside and ordered a second trial solely on the issue of damages. The jury again awarded Graham Ford over $1 million in damages, in addition

---

[1] By way of background, Chris Wallake purchased Graham Ford as a pre-existing business in 2009. Wallake Power Systems, LLC does business as Graham Power Products or Graham Ford, Inc.

to attorneys' fees. On appeal, EDI challenges the damages award; and Graham Ford appeals the district court's attorneys' fee calculation. We AFFIRM.

I.

Graham Ford and EDI were competing distributors of Ford engines and transmissions. Each company had a business relationship with third-party supplier FCS. Before shutting its doors, Graham Ford operated two main business lines. In its "parts" business, Graham Ford purchased unassembled engines, engine components, and parts from FCS that it resold to at least 6,000 customers. In a second, developing, line of business, Graham Ford purchased incomplete engines and transmissions from FCS, completed them, and sold them as "turnkey" engines to a handful of customers in the oil and gas industry—though this number was expected to grow.

Jerry Kosner worked for EDI. In the summer of 2016, Kosner visited Graham Ford's place of business. After the visit, he emailed an EDI executive claiming that some of Graham Ford's engines did not comply with federal emissions laws. Kosner copied Thad Bostwick, FCS's Executive Director of Sales, on this email. FCS began investigating this claim, and EDI provided a PowerPoint presentation to Bostwick detailing its allegation that Graham Ford had shipped engines without the emissions stickers required by federal law. Eventually, FCS terminated its agreement with Graham Ford (the "Powertrain Sales Agreement"), and Graham Ford wound down its operations.

Graham Ford sued EDI for defamation, among other claims. The case resulted in two trials. The first trial was bifurcated between liability and damages.[2] At the liability phase, the jury

---

[2] Graham Ford also brought claims for tortious interference with contract and violation of the Ohio Deceptive Trade Practices Act. Although the jury found EDI liable on these counts, the district court granted EDI's motion for judgment as a matter of law on the ground that Graham Ford had failed to prove actual damages on these claims. So, in the damages phase, only the defamation claim was submitted to the jury.

found EDI liable for making false and defamatory statements about Graham Ford's business that caused FCS to terminate its relationship with Graham Ford, thereby damaging Graham Ford. At the damages phase, Graham Ford primarily sought lost profits from the turnkey engine business, which was in development when FCS terminated the contract. The jury awarded Graham Ford $150,000 in compensatory damages and $1 million in punitive damages. As the trial court later explained, however, Ohio's punitive-damages cap would have reduced the punitive-damages award to $300,000. *See* OHIO REV. CODE ANN. § 2315.21(D)(2)(a) (2021).

EDI moved for a new trial on damages on the ground that Graham Ford's counsel had made improper statements during closing argument. The district court agreed. Specifically, the district court found that counsel for Graham Ford had improperly asked the jury to consider Graham Ford's loss of 6,000 to 8,000 customers as part of the harm to its reputation. That reference, the court concluded, was misleading and prejudicial because it was a "clear and direct reference to Graham Ford's *parts* customers." But Graham Ford had "put forth no evidence that the defamatory comments and termination of the Powertrain Sales Agreement caused harm to Graham Ford's parts business"; instead, "the evidence developed at trial" supported a finding of "harm to Graham's reputation" with respect to its "industrial engine" (or turnkey) business only. The district court granted EDI's new-trial motion.

Before the second trial, the district court held a status conference. The court observed that, in the first trial, the "effect of the libelous comments" on the "parts market" had not been "well developed or developed at all." The court proposed that counsel "look at this case like it's a brand new case" and that the "focus" of the retrial should be any "damage to the parts side of the business." Counsel for both parties agreed, and the court reopened discovery. After the second trial, the jury awarded Graham Ford $826,822 in lost profits; $173,178 for reputational harm; and

$200,000 in punitive damages, plus attorneys' fees in an amount to be determined by the district court.

EDI then moved for judgment as a matter of law or for a new trial. The district court denied both motions. EDI now appeals several aspects of the proceedings below, and Graham Ford appeals the district court's calculation of attorneys' fees.

## II.

We begin with EDI's appeal.[3] EDI challenges the district court's denial of its motion for judgment as a matter of law, its failure to exclude the testimony of Graham Ford's expert witness, and its denial of EDI's motion for a new trial.[4]

## A.

EDI argues that the district court erred in denying its renewed motion for judgment as a matter of law regarding the damages award at the second trial. *See* Fed. R. Civ. P. 50(b). Our review is de novo. *Rhinehimer v. U.S. Bancorp Invs., Inc.*, 787 F.3d 797, 804 (6th Cir. 2015).

---

[3] Much of EDI's briefing fails to cite the record as required by Federal Rule of Appellate Procedure 28(a)(8). We remind EDI "that it is not the Court's duty to search the record for relevant materials." *See In re Kennedy*, 249 F.3d 576, 579 n.3 (6th Cir. 2001).

[4] EDI's arguments contesting the liability finding in the first trial are waived. At the conclusion of the first trial, EDI's motion for judgment as a matter of law challenged only the jury's damages award. Because EDI failed to challenge the liability finding from the first trial in its post-trial motions, it cannot do so now. *See Sykes v. Anderson*, 625 F.3d 294, 304 (6th Cir. 2010) (finding that issues not raised in a party's Rule 50(a) motion are waived).

EDI has likewise waived any objection to the jury instructions in the second trial. EDI protests the district court's rejection of four jury instructions it claims to have proffered at the close of the second trial. But we cannot find in the record any evidence that EDI requested such instructions. Accordingly, this argument is also waived. *See* Fed. R. Civ. P. 51(d)(1) ("A party may assign as error: . . . a failure to give an instruction, if that party properly requested it and— unless the court rejected the request in a definitive ruling on the record—also properly objected.").

When sitting in diversity, we "use the standards for a judgment as a matter of law applicable under the law of the forum state." *Ventas, Inc. v. HCP, Inc.*, 647 F.3d 291, 319 (6th Cir. 2011) (quotation omitted). Here, Ohio law governs, so we must construe the evidence "most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied." *Cunningham v. Hildebrand*, 755 N.E.2d 384, 388 (Ohio Ct. App. 2001). Applying this standard, EDI's motion fails.

EDI argues that its defamatory statements caused Graham Ford nothing more than nominal damages. But several witnesses testified that Graham Ford could not continue operating after FCS terminated the Powertrain Sales Agreement, and Graham Ford's expert witness opined that Graham Ford's closure resulted in $826,822 in lost profit, a sum substantially more than nominal.

EDI counters that Graham Ford could have remained in business by working with suppliers other than FCS. But Graham Ford's owner, its CFO, and its expert witness testified that Graham Ford could not remain profitable by purchasing from alternative suppliers only. EDI also contends that its statements did no significant harm because Graham Ford did not have a good reputation even before EDI's statements to FCS. Graham Ford, however, provided evidence showing that, despite problems with its engines in 2011 and 2012, the company's customer service improved to such an extent that one customer stated that it was "unattainable by anybody else." Thus, reasonable minds could conclude that Graham Ford suffered more than nominal damages. *See Cunningham*, 755 N.E.2d at 388. The district court did not err by denying EDI's motion for judgment as a matter of law.

B.

EDI next argues that the district court abused its discretion by admitting the testimony of Graham Ford's expert witness, Glenn Sheets. *See United States v. Demjanjuk*, 367 F.3d 623, 633 (6th Cir. 2004) ("This Court reviews the admission or exclusion of expert evidence for an abuse of discretion."). EDI objects to several aspects of Sheets's testimony. Each objection fails.

First, EDI charges that Sheets's damages calculation exceeded the scope of the second trial. Specifically, EDI argues that Sheets's task was to calculate damage only to Graham Ford's parts business, but that he also considered damage to "future business expectation(s)" of Graham Ford's assembled-engine business. Relatedly, EDI claims that the district court erred by preventing EDI from questioning Sheets on his understanding of the scope of retrial, as reflected in his expert report. But these arguments fail because EDI misunderstood both the scope of the second trial and Graham Ford's business model. The parties stipulated in the Joint Final Pretrial Order that the second trial was to be conducted on damages stemming from EDI's defamatory statements. In the order granting a new trial and at an earlier conference, the district court had explained that these damages included all "compensatory and punitive damages" stemming from the termination of Graham Ford's relationship with FCS. Because Graham Ford's contract with FCS included both conventional parts and unassembled engines, Graham Ford was entitled to pursue damages stemming from its inability to purchase these items. And that is what Sheets's testimony concerned.

To the extent that EDI claims that Sheets's testimony exceeded the scope of the new trial merely because it included lost profits from the sale of "engines"—whether assembled or not— EDI is mistaken. As the district court explained, "[t]he only item of damage excluded in the new trial was lost business opportunities relating to Graham's plans for turnkey industrial engines—

those which Graham had fully assembled and certified." And if there were doubt on that point, EDI had ample opportunities to seek clarification. Yet EDI failed to clarify the scope of the trial when given the opportunity in the pre-trial conference. And, despite having access to Sheets's expert report for almost a year, EDI failed to object to its scope until the eve of trial. Finally, Ohio Law permits a plaintiff to recover economic losses—including lost income and loss of earnings capacity—in defamation cases, provided there is evidence of a nexus between the damages and defamation. *See Kluss v. Alcan Aluminum Corp.*, 666 N.E.2d 603, 609 (Ohio Ct. App. 1995). Because the jury's verdict in the first trial established that EDI's defamatory conduct caused FCS to terminate its contract with Graham Ford, and the contract had established that FCS would supply Graham Ford with both conventional parts and unassembled engines, Graham Ford was entitled to recover lost profits associated with its inability to purchase these items. For these reasons, EDI's arguments as to the scope of Sheets's expert report fail.

EDI's next two arguments challenge Sheets's methodology for calculating damages to Graham Ford's parts business. First, EDI contends that the district court's order granting a new trial foreclosed Graham Ford's expert from incorporating the number of Graham Ford's parts customers into his damages calculation. Once again, EDI mischaracterizes the scope of the second trial, which was—as the district court explained at a status conference prior to the second trial—a "new trial" that included "the effect of the cancellation of the [P]owertrain [S]ales [A]greement on the parts business." Second, EDI argues that Graham Ford failed to offer evidence of "any parts customer that ceased doing business with [Graham Ford] as a direct result of the defamatory statements." But Graham Ford submitted evidence of its historical parts sales, and its inability to continue its business after FCS terminated the contract, permitting a juror to conclude that these

customers could no longer purchase parts from Graham Ford. Thus, neither of these methodological arguments show that the district court abused its discretion.

Two of EDI's other arguments challenge underlying assumptions in Sheets's report. First, EDI asserts that Sheets ignored the fact that Graham Ford could have continued to buy parts from an alternative supplier, Northern Power. But Graham Ford's owner, Chris Wallake, and Graham Ford's Chief Financial Officer both testified that Graham Ford could not have remained profitable purchasing only from Northern Power because purchases from that supplier would cost more than purchases from FCS and would reduce Graham Ford's profit margin to an unsustainable level. Second, EDI argues that Sheets overestimated damages by impermissibly extending the date of Wallake's retirement. Specifically, when projecting the scope of Graham Ford's lost profits, Sheets assumed that Wallake would retire and wind down the business on December 31, 2023. EDI argues that Sheets should have instead provided an estimate of annual net profits and let the jury project those profits based on its determination of when Wallake would retire, particularly given Wallake's testimony that he had contemplated retirement in 2016. However, Wallake only made that statement in the context of a potential sale of his business that never actually materialized. So, it was not an abuse of discretion for the district court to let the jury decide for itself whether to credit Sheets's assumption that Wallake would retire at the end of 2023.

Finally, EDI asserts that Sheets's report overlooked that Graham Ford had not been profitable in the five years preceding the defamatory statement. But testimony showed that once non-recurring expenses were removed, Graham Ford did make a profit.[5]

---

[5] EDI also asserts that Sheets's report contradicted the district court's order from the first trial when Sheets deducted research and development expenses incurred when Graham Ford rectified some emissions-compliance issues that arose 2011. EDI, however, does not elaborate on how Sheets's analysis of these expenses violated the district court's order from the first trial, or why that order retained significance, so we will not assess the merit of this argument. *McPherson v.*

For these reasons, each of EDI's challenges to the inclusion of Sheets's expert testimony fail.

C.

Finally, EDI argues that the district court erred in failing to grant its motion for a new trial in the second trial under Federal Rule of Civil Procedure 59(a). A court may grant a new trial "when a jury has reached a 'seriously erroneous' result as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1066 (6th Cir. 2015) (quoting *Holmes v. City of Massillon*, 78 F.3d 1041, 1045–46 (6th Cir. 1996)). We review this decision for an abuse of discretion. *Id*. at 1065.

EDI asserts that a new trial is warranted because the district court "made several rulings" that "resulted in manifest unfairness" to EDI. In support, EDI raises many of the same arguments it raised above, including that the scope of the second trial should have excluded losses related to unassembled engines, that Sheets's expert testimony should have been excluded, and that the court erred by rejecting EDI's proposed jury instructions. Because we have rejected each of these arguments, we cannot say that the district court abused its discretion in denying EDI's motion for a new trial.

III.

We now turn to Graham Ford's appeal of the district court's calculation of attorneys' fees. In addition to compensatory and punitive damages, the second jury found that Graham Ford was

---

*Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) (explaining that arguments "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed" forfeited).

entitled to attorneys' fees under Ohio law. Graham Ford sought $633,699.90 for legal counsel. The district court reduced the award to $237,682.50 for three reasons. First, the court excluded all fees arising from the second trial; second, it reduced the hourly rate for each attorney; and third, it lowered the estimated hours billed by 33% across the board. Graham Ford challenges each decision. "We review a district court's decision of whether to award attorney fees under the 'abuse of discretion' standard." *Wikol ex rel. Wikol v. Birmingham Pub. Sch. Bd. Of Educ.*, 360 F.3d 604, 611 (6th Cir. 2004) (citation omitted).

## A.

The first question is whether Graham Ford is entitled to attorneys' fees for both the first and second trial. In diversity cases, state law governs whether an award of attorneys' fees is proper. *Hometown Folks, LLC v. S&B Wilson, Inc.*, 643 F.3d 520, 533 (6th Cir. 2011). And under Ohio law, a plaintiff may recover reasonable attorneys' fees when a jury awards punitive damages in a tort case. *Columbus Fin., Inc. v. Howard*, 327 N.E.2d 654, 658 (Ohio 1975) (citing *Roberts v. Mason*, 10 Ohio St. 277 (Ohio 1859); *Peckham Iron Co. v. Harper*, 41 Ohio St. 100, 109 (Ohio 1884)). But may a plaintiff recover attorneys' fees for two trials when the trial court granted a new trial motion in the first? In cases involving federal civil-rights statutes, we have held that federal fee-shifting statutes permit an award of attorneys' fees for multiple trials, "so long as [the] plaintiff's actions are not responsible for the need for a second trial." *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 826 (6th Cir. 2013) (citation omitted). Both the district court and Graham Ford rely on this line of federal cases, and neither cites any Ohio authority to the contrary.[6] Lacking any basis to believe that Ohio courts would conclude otherwise, we apply the federal rule here.

---

[6] EDI did not file a brief with respect to the attorneys' fees appeal.

The district court declined to award Graham Ford attorneys' fees for the second trial because, in its view, that trial was Graham Ford's fault. In short, the court ordered a new trial because Graham Ford's counsel improperly referred to reputational harm to its parts business without establishing at trial that it was pursuing lost profits for the "parts" side of the business.

On appeal, Graham Ford argues that, despite its counsel's unsubstantiated reference in closing argument, the second trial was caused by the district court's error, not Graham Ford's. Graham Ford claims the district court originally misunderstood the scope of Graham Ford's contract with FCS. Had the court properly understood the contract, Graham Ford contends, the district court would not have ruled its counsel's statement out of bounds, and the second trial would not have been necessary.[7] As evidence of the district court's confusion, Graham Ford relies on the court's admission during a sidebar at the second trial that there was not any "distinction between parts and engines" in the FCS contract, and any attempt "to draw [a] distinction between parts and engines is not relevant [to the damages claim]. . . . [S]o if the Court has confused things by earlier referring to parts, thinking that there was some distinction under the contract, then that's my fault,

---

[7] In other words, Graham Ford seems to believe that the district court erred by granting EDI's new-trial motion under Federal Rule of Civil Procedure 59(a). Graham Ford did not appeal that order after the second trial, though it could have. *See Duncan v. Duncan*, 377 F.2d 49, 52 (6th Cir. 1967) ("Although an order granting a new trial is generally not [immediately] appealable, it is clear that such orders are reviewable on appeal from the final judgment in the second trial."). The remedy, had Graham Ford successfully appealed, would have been to reinstate the original verdict and judgment. *Id.* at 55. *See also* 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2818 (3d ed. 2023) (collecting cases). That would have been a poor outcome for Graham Ford. The first jury awarded Graham Ford $150,000 in compensatory damages and $1,000,000 in punitive damages. But, as the district court pointed out, applying Ohio's punitive-damages cap would have reduced the punitive damages to $300,000, resulting in a net award of $450,000, plus attorneys' fees for the first trial. The second jury awarded Graham Ford $1,000,000 in damages and $200,000 in punitive damages. Because the punitive damages are not more than twice the compensatory damages, the Ohio punitive-damages cap does not apply. So Graham Ford's net award is $1.2 million, plus attorneys' fees from the first trial. The difference between the two awards is $750,000, substantially more than the fee award Graham Ford sought for the second trial.

but it's not the plaintiff's fault." But, as the district court explained, it was not this confusion over the contractual relationship between Graham Ford and FCS that caused the second trial. Rather, the second trial arose because Graham Ford failed to establish in the first trial that EDI's defamatory conduct harmed its parts business. In fact, Graham Ford's theory of harm in the first trial was focused almost entirely on its speculative turnkey-engine business, not its parts business. Sheets's expert report in the first trial focused on harm to Graham Ford's prospective turnkey-engine business, as did most of Wallake's testimony in the first trial. To be sure, Wallake's testimony included two references to Graham Ford's parts business, but these references alone were insufficient to establish that any reputational harm from EDI's defamatory conduct injured Graham Ford's parts business. In the second trial, Graham Ford was able to show that EDI's defamatory statements harmed its parts business. However, that relationship was not clear from either Graham Ford's theory of harm or the evidence it presented during the first trial. Based on this record, we cannot say that the district court abused its discretion by excluding all fees associated with the second trial from its attorneys' fees calculation.

B.

Next, we turn to Graham Ford's argument that the district court abused its discretion when conducting the lodestar calculation for the remaining attorneys' fees. The lodestar method "approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case," based on local rates. *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551 (2010). There is "a 'strong presumption' that the lodestar figure is reasonable." *Id.* at 554.

The district court did not abuse its discretion here. To start, the district court could not rely on Graham Ford's proposed calculation of fees. Graham Ford's blended-rate approach averaged

each lawyer's rates across the four years of litigation, but the exclusion of fees associated with the second trial invalidated this approach. As an alternative, the district court relied on the Ohio State Bar Association's 2019 Report to estimate the hourly rates of Graham Ford's attorneys. This report is from the same year as the first trial, provides information on hourly rates for attorneys in Ohio based on their years of experience, and its use has been upheld by this circuit. *See e.g.*, *Corbin v. Steak 'n Shake, Inc.*, 861 Fed. App'x 639, 649 (6th Cir. 2021) (concluding that district court did not abuse its discretion by reducing an attorney's hourly rate to that listed by the Ohio State Bar Association); *Hines v. City of Columbus*, 676 F. App'x 546, 549, 555 (6th Cir. 2017) (same). This approach was reasonable. The district court did not abuse its discretion by using this report to calculate the hourly rate for Graham Ford's attorneys.

C.

Finally, Graham Ford argues that the district court abused its discretion by reducing its estimated hours billed by 33% across the board. The district court reviewed the billing entries and explained in great detail its reasons for concluding that the bills were excessive in light of the work required. The district court then concluded that an across-the-board percentage reduction in hours was an appropriate "corrective measure for counsel's excessive billing and duplication of effort." This reduction was reasonable. *See e.g.*, *Hudson v. Reno*, 130 F.3d 1193, 1209 (6th Cir. 1997), *abrogated on other grounds by Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843 (2001) (affirming 25% reduction in fees for duplication of costs); *Richard v. Caliber Home Loans, Inc.*, 832 F. App'x 940, 948 (6th Cir. 2020) (affirming 50% reduction in fees for billing deficiencies). The district court did not abuse its discretion.

\* \* \*

For these reasons, we AFFIRM.